1-6-5-1-4-9-3-5-1-5-8. Hamilton County Emergency Comm v. Bellsouth Telecommunications. Are there any non-custodians inside? If there is, I'd like to speak to you about it. May it please the Court, I am Rick Hitchcock of the Chattanooga, Tennessee Bar, and I'm joined here today by Bud Jackson and Kathy Dorval of my firm. We represent the 10 9-1-1 districts that are the appellants in these consolidated cases. Together, these 10 districts provide emergency communication services to 20% of the people of Tennessee. The parties are sharply divided on the factual issues in the law. Those were my words. Those were the words of the trial court on the second page of his opinion before he nevertheless proceeded to grant summary judgment to Bellsouth. We agree that there are sharply divided issues of fact, but there's one fact that is not disputed because it has been admitted by Bellsouth through its expert. In every district, in every month before the first suit was filed, Bellsouth failed to bill thousands of lines, the 9-1-1 charges that the law required. How many lines were unbilled? Is the admission that you refer to, it's not an admission that they owed fees with respect to those lines, I take it. I mean, they have a defense, right or wrong, they have a defense to that, as I read it. Your Honor, the defense, there are two different sets of data that the expert produced. Okay, that's your word, admission. Well, the admission focuses on the number of lines that were not billed. Yes. How many lines in total were unbilled and what kind of lines those were and other disputed issues should have been resolved by trial jury, not by the trial judge. We also agree that there are dramatically different views of the law. Chief among those is the position that Bellsouth asserts that you're powerless, this court is powerless, to recognize a remedy for Bellsouth's deliberate refusal to bill tens of millions of dollars in 9-1-1 charges. So under Bellsouth's position, no suit could be brought by anybody to challenge their failure to bill for these several different theories that you have as to why they should have billed, correct? There's no other alternative entity that could bring this suit, right? That's exactly right. They contend that there is no remedy, period. There is no party that can bring the suit, there is no suit or claim that can be brought. So as you understand Bellsouth's position, it is that the law set up the districts, required the districts to provide the service, set up the funding mechanism, but there is no way to enforce that. That is precisely the position that they have taken, Your Honor. And that is where we are as a result of the two decisions of the district court below. And is this a matter of state law? Yes, Your Honor, it is a matter of state law. Should we certify this as a question to the Tennessee Supreme Court? Your Honor, that would be one option. In fact, a federal court in Georgia recently did that on a similar lawsuit that has been brought in the state of Georgia. We don't think it's necessary because we think the law is clear as it stands. In fact, for example, on the implied cause of action claim, the Tennessee Supreme Court ruled just this last April in the case that involves the American Heritage Apartments on what are the standards? Are they hard to meet or are they easy to meet? And what American Heritage Apartments said is that an implied cause of action will readily be found when there are three things that are present. When the party who is bringing it is an intended beneficiary, and as Judge Batchelor said, certainly the districts are an intended beneficiary of that law. Second, is there an indication of intent by the legislature that such a suit be permitted? Here there are at least three of those indications, including the one that was recognized in American Heritage, and that is simply that the districts, because they are municipal governments and were set up as municipal governments, have the right to sue and be sued. And in fact, this same district judge has entertained favorably a lawsuit by the lead plaintiff in the past. So is — I was confused about the right to sue or be sued aspect. Yes, Your Honor. Because I think in that — I'm thinking it was the Alabama case where it was in the particular statute having to do with 9-1-1, whereas here you're relying on a general right of the entities to be municipal entities to sue or be sued. Is that right? That is exactly right. But here's the difference, Your Honor. In Alabama, the state legislature sought or set up a special kind of district to provide 9-1-1 services. Here in Tennessee — or in Tennessee, excuse me, not here — in Tennessee, the legislature specifically chose to designate these entities as municipal corporations. And for 100 years, Tennessee law has recognized that whether it's expressly stated or not, a Tennessee municipality has the right to sue and be sued. So it's the same effect, done a different way, but exactly the same effect. And the third standard is — that was recognized by the Brown decision and the American Heritage is simply that a right to bring a private cause of action is not inconsistent with the purpose or is consistent with the purpose of the statute. Here the legislature said that the viability of the 9-1-1 service in Tennessee is of the highest priority for the health and safety of the citizens. And certainly the ability, through some mechanism, to enforce the 9-1-1 charges that were set up to fund that service is consistent with the Act. But there is a little peculiarity in that there's a particular provision allowing the districts to sue users. I beg your pardon? There's a particular provision allowing the districts to sue the users, i.e., the customers, for not paying the 9-1-1 charge, but there's no particular provision saying that they can sue the providers. There are two sections that need to be read together to understand that provision, 108 and 110 of the statute. What the statute says is that a billed user is liable for the charge, for any valid charge. That's in 108. 110 says that a service user can be sued if the charge is not paid. Your Honor, excuse me. Correct me if I'm wrong. Doesn't the statute say a — or maybe you did just say that, that the billed user can be sued if he doesn't pay that bill? Precisely. The suit cannot be brought unless the user has been billed. There would be no valid charge for the user to pay. The districts have no idea who the customers are. BellSouth has adamantly refused to tell the districts who the customers are. So you're exactly right, Your Honor. There must be a billed user before there can be an action under 110. And here the issue is the BellSouth simply didn't bill them. So they never became liable for the charges and they cannot be sued under 110 or any other theory for that matter. By the way, that suit could be brought by either BellSouth or by the district. Go back for a moment, if you would, please. Go back to intended beneficiary. Yes, Your Honor. And the district court said the intended beneficiary, for Pete's sake, is the public and stopped there. But if you go to the definition, we'll use the federal definition because, in fact, that's what, after Brown, they actually adopt the federal definition, right? You know that. The intended beneficiary element is part of the- From Court v. Ash, they adopt that. It comes out of that case that was adopted by the Brown decision by the Tennessee Supreme Court. So the first proposition in the definition is the plaintiff is the plaintiff one of a class for whose special benefit the statute was enacted, to paraphrase, right? Exactly. So can we say with a straight face that the statute was enacted for the benefit of districts? Certainly, Your Honor. In fact, 27 of the 29 provisions of the emergency communication district law deal with the organization, the creation- Districts do need districts, right? You have to have them, but is it for their benefit? Well, Your Honor, we believe it certainly is. They have a duty. As the district judge recognized in that earlier case that we referred to in our reply brief, the district has a duty and an obligation to set up and run the 911 service in the county for which it has been established, and it cannot do that without the funding. Is there any other provision in the statute that deals with or permits any other funding source or mechanism? The statute permits local governments to contribute toward the 911 districts, and in some cases the local governments do. But in every one of the 10 districts that are before you, the charges from the 911 charge or the fees from the 911 charges are the vast majority of their budgets. And, in fact, Bell South has been the largest telephone company in each of those districts, so Bell South's refusal to bill has had the greatest impact upon the ability of those districts to fulfill their obligations. Your Honor, I'd like to speak a moment on the interpretive disputes issue that was used by the district court as a way to avoid reaching several of the causes of action, but particularly the false claims that cause of action. The district court held that Bell South's failure to bill was excused by what it referred to as, quote, interpretive disputes about some of the lines that Bell South chose not to bill. And I emphasize some of the lines, because there were only four types of lines that Bell South articulated interpretive disputes about. Many more lines were not billed. The district court required the appellants to meet a standard that is unknown to the law in relation to that interpretive disputes issue, requiring them to prove at the summary judgment stage that Bell South's interpretations were, quote, so unreasonable that the agreements could not have been made in good faith, and thus no legitimate grounds for disagreement existed. Now, Your Honor, Bell South even admits that that's the wrong standard. The standard is, were the interpretive disputes reasonable? Were the interpretations reasonable? Now, reasonableness is a quintessential issue for a jury. And a jury could and we believe would have found that the interpretive disputes were not reasonable. Bell South, in fact, claims to have had interpretive disputes with just about everybody, with the state agency that runs or oversees, doesn't run, but oversees the ECD law, with the Tennessee Attorney General, with other courts that have considered the issue, with its own employees who told their superiors that Bell South was not obeying the law, with its competitors who were obeying the law. In fact, Bell South had interpretive disputes with itself, because it started out billing 9-1-1 charges on several types of lines and then changed its mind. And in its brief, it even says it has interpretive disputes with its own expert. Your Honor, a jury reasonably could find that Bell South was not reasonable in the interpretations that applied for those four types of lines. A jury will also, we believe, find that there are many other types of lines as to which Bell South never articulated an interpretive dispute, but which it nevertheless chose not to bill. And why did it do that? Do you have an estimate of how many types of lines there are? We know they responded about four. Are there, do you know that there happen to be? Let me give you two examples. Let me give you two examples, if I could, Your Honor. One is Bell South had a system where it would set up a special code for lines. It called it zero-rated USOCs. And it would set up a code that when a salesperson sold that kind of line, it would be zero. Unfortunately, your time is up, and I asked that question. So how many? Your Honor, we don't know, because Bell South has not. That's why I asked. You don't know. We don't know, but we know there are others. But is that because you have not been able to get discovery from Bell South to find out? Exactly. That's exactly why, Your Honor. Thank you very much. Thank you, Your Honors. I'd like to start by correcting something about what our position is. Our position is not that there was no remedy. Our position is that these remedies were the wrong ones. Who could sue? The districts had a number of options. And I'd point you to page 54. It's 20837 of the record, where the district court notes that as the districts themselves recognized in 2006, Williamson County sought to go to the Tennessee Regulatory Authority to enforce the Tennessee Regulatory Authority's rules, which at that time required telephone companies to pursue or to provide audits to districts. These districts never availed themselves of that remedy. These districts could have filed a suit for a declaratory ruling, because like the Federal Declaratory Judgment Act, the Tennessee Declaratory Judgment Act allows you to proceed even if you lack a right of action. So under our theory, there were remedies. They're not damages remedies, because Bell South is not the taxpayer. Now, I'd also step back and note that affirming the Court's judgment here does not require adopting our theory of the law, because the district court allowed these districts to proceed on six damages actions. The False Claims Act, the fiduciary duty claim that they're pursuing here on appeal, and four others, two that were lumped together, that they have abandoned on appeal. What the district court found is that they couldn't, after 18 months of discovery, and Judge Batchelor, there was no 56D opposition to our summary judgment motion, no claim that summary judgment couldn't be granted because additional discovery was required. The district court properly canvassed the record, made all factual inferences. He assumed we made false statements. We disputed that. Well, there was no – so procedurally, get me straight. There were cross motions for summary judgment. That's correct, Your Honor. Okay. Okay. But the other remedies, there might be a rationale for why telephone, so-called telephone companies cannot be sued for damages. There might be a public policy rationale. Do you – can you cite that there is such a thing? Sure, Your Honor. The statute sets up a system where end users, the citizens of these districts, are supposed to pay for the 911 system. And I apologize, I forget which of Your Honors asked this, but the statute does indeed have additional funding mechanisms. The districts in these 25 provisions are obligated to operate these 911 centers. They don't actually have to tax their citizens through their phone bills. They can just tax their citizens through property taxes. Well, if that's true, why wouldn't the districts be an intended beneficiary? Because the districts have duties. We have duties, too. We have to go, and if they do decide to go the 911 route, we have to bill and collect. And BellSouth made good faith as the district found efforts to do that. And the statute provides us compensation for that effort. The mere fact that the statute says to the districts, in the alternative from using your own direct taxation of your citizens, you can indirectly tax them through phone bills, that's not a benefit of the type recognized under Court v. Asher-Brown as the kind of benefit that makes you able to have a right of action. And the Brown case also, I'd note, says that merely being the intended beneficiary is sufficient. I'm sorry, is not sufficient. You need the others. And so let's look at the others, too. We have a legislature that knows how to create rights of actions. And in a statute where the legislature gave an express right of action, there is little to say. How would that work if BellSouth, under the statutory scheme, BellSouth is supposed to bill and the direct right of action is only against billed customers? But the bone of contention is that we're talking about BellSouth's not billing, and so you're not dealing with billed customers. So two points, Your Honor. First, the statute actually says that the right of action is to recover any proper service charge. And the customer's obligation to pay, I would think, could be argued, and the districts haven't chosen to do this, but could be argued to exist independent of whether it's billed. The obligation is not. How would they know they were supposed to pay? There's the audit right that they never invoked. And, again, the district. No, no. How would the customers know they were supposed to pay if they're not being billed? The district could send them a notice of the charge. But I think the more important answer, Your Honor, is that under the Brown test and the Court v. Ash test, the fact that — I'm not saying it's right. For there to be no implication that the legislature intended additional rights of action that it didn't think to write down, that there needs to be a right of action squarely on point. The fact that the legislature went out of its way to create a right of action is in itself evidence and that the legislature thought about what rights of action should exist, made decisions about what rights of action should exist, and didn't create a right of action that says, telephone companies, if you for some reason don't bill, perhaps because this antiquated statute hasn't kept up with the current realities of telephony, and so there's a disagreement, reasonable ones, and it turns out it breaks against you and not in your favor, then you're on the hook. Right? We are caught between two extremes. We are really the intermediary, the functionary. We don't want to over-bill. Do the Court v. Ash and Brown standards apply to implying a public right of action or are they mostly applying to implying a private right of action? So typically, Your Honor, they come up in the context of private parties claiming a right to sue under a statute. And the American Heritage case that my colleague mentioned is just such a case. The entity being sued there was the public entity. There was no reliance on the sue or be sued clause there to let the public entity do the suing. But I would think that the Court v. Ash test applies with even greater force in the context of a public body. After all, the legislature, I would think, can be expected to take care of and ensure that the statute works to the benefit of its own subsidiary entities. The legislature thought that the fact that a corporate body that's a public body has a right to sue or be sued under municipal law of Tennessee and, therefore, they didn't need to put in that the districts could sue. Well, they did, Your Honor. They expressly put in that the districts could sue customers. The customers, which seems like a bizarre thing. So why would the legislature choose to put in this very picayune remedy of being able to sue customers and not the bigger remedy of putting in the ability to sue Bell South? One reason could be, well, they explicitly didn't want to do that, and you could maybe have legislative history or something. Or another reason could be they thought, of course, they can sue the supplier, but this bizarre area of suing the customer needs to be made explicit. Well, Your Honor, again, the statute is very clear whose responsibility it is to pay. And there's not a word in the statute nor in the legislative history that suggests that in the event no billing occurs, and, again, whether it's for any reason at all, that Bell South is, therefore, effectively made jointly and severally liable with the customers. That's an unusual regime. And it's not one that you find in 9-1-1 statutes around the country. So to suggest, and under the Court of Appeals, of course, the burden is on the districts to identify the source of a right of action and to prove it. So the question that I sort of raised in the beginning, nobody on the other side, counsel on the other side was not taking advantage of that suggestion, why not certify this to the state court, the state supreme court, since it is a matter of Tennessee law trying to figure out what Tennessee, the legislature, intended here? Because it does seem to come down to that intent factor in the Court v. Ash v. Brown. Sure, Your Honor. So I think certification would be inconsistent with this court's precedents, which articulate in the Pennington case and BKB properties that where there is an articulable and clear standard to apply. And here it's the Court v. Ash standard, which this court is quite familiar with. It's not as though Tennessee has its own unique spin on those factors. So I don't think this is the kind of case that requires certification under the court's precedents. This court also encourages parties where there's a certifiable issue to raise it at the district court level and not wait until they have lost. I note that in Georgia they're not raising it. I understand that. But just from a timing perspective, the timing, the district court thought the standard, the test was the one he was familiar with. And Judge Collier applied it consistently with Federal and State case law. And there really is, and I think this is important, there is literally no case from Tennessee that the other side cites and has ever cited in the course of this case in which a damages action was implied against, there's just no, and there's nothing. The closest they come is this American Heritage case, and that is radically different. That's an administrative review case. That's a customer. But there's also the issue of the False Claims Act, the Tennessee False Claims Act issue, which is my understanding is there are virtually no cases, maybe ten. There are very few Tennessee False Claims Act cases, but the Tennessee courts have said it's okay to look to Federal law. And if I can turn to that in my time remaining. The district court didn't resolve any factual disputes. The district court said viewing the facts in the light most favorable to the district, all they had were a series of interpretive disputes involving an ambiguous statute as to which BellSouth had reasonable interpretations. He didn't require them to prove anything more than that our interpretations were unreasonable, and he found that their efforts were lacking. What do you say to counsel's argument that the district court was, I'm putting words in his mouth, rather slipshod in only addressing four types of lines? Your Honor, the district court addressed what the parties briefed. Okay. That's the answer. Beyond those four types of lines, they've identified two, literally two, one-off issues. One is this quote-unquote zero-rated USOC issue, which affected a de minimis number of lines, and BellSouth corrected it, as the evidence shows, within months of it coming to their attention. That's undisputed in the record. The only other example given in the opening brief, there's one extra in the reply brief, and I'll turn to that. The only other example is where the record shows that a BellSouth employee wrote the wrong number down on a bid proposal, and the Hamilton County witness, who was responsible for picking the winner of that bid, testified that it would be ridiculous to think that that error affected the choice of winning party. That's it. The third one in the reply brief, that actually involved a wireless company that's not a defendant here, BellSouth's wireless affiliate. So that big chart that takes up so much space in the opening of the brief, that is based on, and I brought it up here, our expert, and it's at page 19933 of the district court record, who's not an attorney saying this. I'm not an attorney. I'm not opining on the legal question of whether BellSouth owes this money or not, but for purposes of my analysis, I am going to assume, I'm going to assume that BellSouth should have billed. And that's where those lines come from. And once, and this is the multiplex line dispute, and once BellSouth changes its multiplex billing, as you can see in the chart, those lines disappear. In fact, sometimes they turn positive. That our expert calculated that we were actually collecting more from our customers than we should have. There is no tens of millions of dollars of unaccounted for lines that are not covered by the interpretive disputes that were front and center and the focus of the litigation in front of the district court. It's just not reality. I think I've covered, and I guess where I just land on the False Claims Act, what we really do have here is a statute that's now been changed, right? It's now been updated, effective January 1, 2015, to do a couple of things. It clarifies all of the interpretive disputes. And that's why the district court found no need to issue a declaratory ruling, because they had been mooted going forward. And it creates a new, and I think this is important, administrative claims process that can involve a telephone company being held liable for under collections, but not through lawsuits, not through damages actions, not through county-by-county litigation, but through the same taxing process. I'm scooting back, if I could, please, to the procedural posture of the case and the summary judgment. And counsel does argue that we could never get what we wanted. I mean, were there discovery disputes, and were the districts prevented from getting information they needed in the discovery phase of this case? Not to my knowledge, Your Honor. There were 50-plus depositions, extensive. I didn't handle the case through summary judgment. But you're familiar. But being familiar with it, there were 50-plus depositions, gigabytes and gigabytes of data. Our expert went through, and this data was available to them, our expert went through and reconstructed months and months of billing from the ground back up. I'm not aware of any discovery dispute that was presented to the court where the court held that we should have given over data, and we haven't. That's just not a thing, Your Honor. That's not a thing. If the court has no questions, I'm probably out of time anyway. So if the court has any questions, I'm happy to answer them. I think we do not. Thank you, counsel. Thank you, Your Honor. Your Honor, if I could address Judge Cook's question first. There was a very strong dispute over the access of the districts that they asked to the simple question of how many lines did Bell South have every month, business lines, residential lines and multiplex lines. And that motion to compel was not granted. It was held in abeyance by the magistrate judge because there was by then a scheduling order down that set forth briefing schedules for dispositive motions. But the court said clearly in her order, and I apologize I can't give you the exact site in the record, but the court clearly said in her order that if the matter continued, it would be readdressed and Bell South would be required to provide additional information. Your Honor, let me address three. In moving for summary judgment, right, the districts moved for summary judgment, was there, how did the court know that there was continuing complaints about discovery? The district moved for summary. That's the only one, right? No, Your Honor. There were many disputes about discovery. There were many disputes about discovery. That was the only one that got to a motion to compel stage where the district magistrate judge indicated that she would not rule on it because of the pending motions. But she indicated that she would be inclined to do so if they were, if Bell South did not prevail. The district did file a motion for summary judgment on the fiduciary duty claims and on the request for declaratory judgment that we had made. Your Honor, real quickly, if I could address two points. First of all, the remedy issue, I would remind the court as we have put it into the briefing, that the legislature readdressed its intent to permit an implied cause of action in this case when it passed Tennessee Code Annotated 13119 sub c sub 4. And the legislative history in that makes clear why they did it. They did it because they recognized that the districts had litigation pending that they did not want to preempt, that they approved going forward in order to recover these fees. Your Honors, in the time since we've talked, there have been dozens of 911 calls that have been made to the district's call centers. In that time, those calls have been answered and emergency aid has been dispatched because of the funding mechanism that was set up and that others of Bell South's competitors have obeyed and that Bell South has obeyed only when it wanted to obey. Bell South's own expert has admitted that there were thousands of lines that were unbilled, admitted it in two places that are set forth in our briefing. One is on page 13 of our reply brief in which we have a table there in which the district, in which the Bell South expert admits that in December 2010 alone, there were 32,000 lines that weren't billed. And then the next two pages over on page 15 is the chart that shows, in fact, that in every month for every district before the first lawsuit was filed, Bell South did not bill thousands of lines. Your Honors, this court has recognized a principle that is as old as the law itself, that those who commit wrongs cannot act with impunity. This court has applied the proposition that was approved by the Michigan Supreme Court, which stated when a statute provides a beneficial right with no civil remedy for its securance, the common law on its own hook provides a remedy, thus fulfilling the law's pledge of no wrong without a remedy. In the end, this is a simple case. It's a simple case about a company that chose not to obey the law, even when that disobedience harms something as critical as the 911 system. It's a simple case and there are remedies that are straightforward. And they don't involve audit rights that, frankly, Bell South continues to contend existed, but they don't. And I would refer you to pages 11 and 12 of our reply brief and the footnote there that makes clear that Bell South was supposed to, during a five-year window starting in 1995, provide an audit right, which it never did. There are no audit rights. There never have been audit rights. There never have been any other remedy. The law needs to provide one. This court can do so. We ask that on behalf of the people that the district serves that you do so. Thank you. Thank you, counsel. The case will be submitted. There will be nothing further this afternoon. The clerk may adjourn the court.